ST. LOUIS (NORTHWESTERN UNION PACKET CO. v.). See Case No. 10,345.

## Case No. 12,236.

ST. LOUIS, A. & T. H. R. CO. v. INDIANAPOLIS & ST. L. R. CO. et al.

[9 Biss. 99.] [1]

Circuit Court, D. Indiana. Sept., 1879.

RAILROAD COMPANIES—LEASE—RENT—GUARANTY—EQUITY—JURISDICTION—REMEDY AT LAW.

1. Certain of the defendant railway corporations had made an agreement with the complainant corporation by which they had guaranteed, that the I. & St. L. R. R. Co., lessee of the complainant's railway lines, should pay to the complainant a certain minimum rental. The guarantor companies were the holders of the bonds of the I. & St. L. R. R., lessee, to a large extent, and the latter company having failed for nearly two years to pay the rental due complainant: *Held*, that the court would require the lessee to pay the minimum rental due complainant before the payment of any portion of the interest on such of its bonds as belonged to the guarantor corporations, or any other sums which might be due them, and that an injunction to that effect would be issued, and the guarantor corporations further enjoined from disposing of such bonds.

2. *Held*, further, that the fact that the complainant had a right of action at law against the guarantors for breach of warranty, did not

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

deprive the court of·equity of its jurisdiction of the case.

In equity.

McDonald & Butler, for complainant.

R. P. Ranney, S. Burke, Baker, Hord & Hendricks, and Dye & Harris, for defendants.

GRESHAM, District Judge. Previous to May, 1867, the Cleveland, Painesville & Ashtabula R. R. Co., owner of a road running east from the city of Cleveland, Ohio, since by consolidation becoming the Lake Shore & Michigan Southern Ry. Co., defendant; the Cleveland, Columbus & Cincinnati R. R. Co., owner of a road running from Cleveland to Cincinnati via Columbus, and the Bellefontaine Railway from Indianapolis to Crestline, said last two companies by consolidation becoming the Cleveland, Columbus, Cincinnati & Indianapolis Ry. Co., defendant; the Pittsburg, Fort Wayne & Chicago Ry. Co., owner of a road running from Pittsburg via Crestline to the city of Chicago, defendant; the Pennsylvania R. R. Co. and the Pennsylvania Co., defendants, then transacting their western business via the P., Ft. W. & C. to Crestline, and via the Bellefontaine road from Crestline to Indianapolis; and the Indianapolis, Cincinnati & Lafayette R. R. Co., operating a line from Cincinnati to Indianapolis; all being desirous of procuring and controlling a through line from Indianapolis to St. Louis, (the only railroads then connecting said last-named points being the Terre Haute & Indianapolis and the St. Louis, Alton & Terre Haute, complainant herein,) entered into negotiations with complainant for the use and control of its said railway from Terre Haute to East St. Louis. As a result of these negotiations, on May 17, 1867, said defendants above named entered into a contract with complainant, denominated in these proceedings as the first contract of guaranty, by the terms of which said defendants agreed that the T. H. & I. Co., on or before the first day of July, 1867, should execute as lessee the operating contract, or lease. mentioned in, and the foundation of, said first guaranty, or in default of said T. H. & I. R. R. Co. becoming lessee, "any other responsible corporation owning or constructing a railroad from Indianapolis to Terre Haute * * * shall be accepted in lieu of said T. H. & I. R. R. Co., provided that if such substitution be made the party of the fifth part," complainant herein, "shall be fully indemnified for all loss, damage or temporary diminution of business which may result therefrom," and by the terms of which said first guaranty said defendants further promised and agreed "that the said T. H. & I. R. R. Co., or such other corporation as may be substituted therefor, shall at all times hereafter keep, observe and perform all and singular the covenants, conditions and provisions of the aforesaid contract, provided,

nevertheless, that all the obligations of each of the said parties of the first, second, third and fourth parts, created hereby, shall be several and not joint, and as to each of them for the equal fourth part of any damage arising from any default of the said T. H. & I. Co. or the said other corporation, or for any breach by all said parties of this agreement." This first guaranty was executed by the I., C. & L. R. R. Co., the P., Ft. W. & C. Ry. Co., the Penn. R. R. Co., the Bellefontaine Ry. Co., the C., C. & C. R. R. Co., the C., P. & A. R. R. Co.

On the same day, May 17, 1867, and as a part of the same instrument and agreement, the St. L., A. & T. H. R. R. Co., complainant, executed and delivered to said guarantors the operating contract or lease with the T. H. & I. R. R. Co. as lessee and party of the first part, by the terms of which it was, in substance, agreed that said T. H. & I. R. R. Co. should have the use, possession and control of complainant's railway from Terre Haute to East St. Louis, including the Alton branch, together with the equipment thereof, as then owned and used by said complainant upon said part of its railway, for the period of ninety-nine years from and after June 1. 1867; that said lessee should, by or before December 31, 1868, expend in repairs and betterments of complainant's said railway the sum of $500,000; and should at all times during said period keep and maintain complainant's road-bed, track and property in the condition of first-class western railways; and that said lessee should, during all of said period, procure and own, together with complainant's said equipment, an equipment ample and sufficient to do the entire business of the road, without resorting to any hired equipment; and that said lessee should at all times, at its own cost, keep said equipment in the condition and repair of first-class western railways; and by article 19 of said lease it was provided that "this contract shall become operative as of the first day of June, 1867;" and by article 11 of said contract it was provided that if at any time complainant defaulted in interest upon its bonds, said lessee should have the right to pay said interest so in default, and charge the sum so paid against complainant's rent reserved; and by article 16 of said contract it was provided that if the lessee failed to pay the rent reserved and stipulated for, complainant might re-enter and take possession of its said road, or might take such other or further action for the enforcement thereof as it might deem advisable. The material parts of said lease are contained in articles 5, 6, 7, 8, 9, and 12, which are as follows:

"Article 5. The party of the first part, operating said railroads during the term aforesaid, shall, from time to time, have full authority to fix all rates of passenger fares and of freights on all business done upon the said main line of railroad and the said Al-

ton branch thereof; provided, however, and it is hereby expressly declared and agreed, that for the purpose of expressing the limitation of such authority hereinbefore provided, all business which shall be done partly on the St. L., A. & T. H. R. R., and partly on either the I., C. & L. R. R., or on the Bellefontaine Ry., or on the C., C. & C. Ry., or on the C., P. & A. R. R., or on the P., Ft. W. & C. Ry., or the Penn. R. R., is herein denominated joint business; and that the rates on such joint business shall at no time, and in no instance be fixed lower per mile for the said St. L., A. & T. H. R. R., or the branch thereof, or for any part of the same, after proper allowance shall have been first made and deducted for terminal expenses, than shall be charged per mile on such joint business by or for the said T. H. & I. R. R., or by or for either of the aforesaid railroads upon which such joint business shall be partly done.

"Article 6. The said party of the first part, keeping and performing all and singular the terms, provisions and conditions of these presents, and making the payments hereinafter required, shall and may, at all times during the period of ninety-nine years aforesaid, demand, collect and receive any and all fares, charges, freights, tolls, rents, revenues, issues and profits of the said main line of railroad extending from Terre Haute to East St. Louis aforesaid, and of the said branch thereof to Alton aforesaid.

"Article 7. The party of the first part shall, in each and every year of the term of ninety-nine years, pay, or cause to be paid, to the party of the second part, in the manner and at the times hereinafter provided, thirty per cent. of the gross earnings of the said railroad from Terre Haute to East St. Louis, and the branch thereof to Alton, until such gross earnings for such year shall amount to the aggregate sum of two millions of dollars, and twenty-five per cent. of any excess over two millions of dollars, until the whole earnings for such year shall amount to three millions of dollars, and twenty per cent. of any excess over three millions of dollars of gross earnings for such year; and such percentage of the gross earnings for each such year shall be paid over without any deduction, abatement or diminution for any cause whatsoever, every demand or claim accruing, or to accrue, to the party of the first part, being hereby declared to be chargeable on that portion of the gross earnings which the said party is, by the next succeeding article hereof, empowered to retain as therein provided; but it is hereby expressly agreed that the aforesaid payments shall amount in each and every year to at least four hundred and fifty thousand dollars, which is hereby agreed upon as a minimum for each and every year, and is to be paid absolutely, without reference to the percentage which it forms of the gross earnings of such year, and without leaving or creating any claim or

charge upon the earnings of any future year.

"The manner and time of payment hereinbefore provided shall be as follows: On the first day of July, 1867, and of every month in each year thereafter, shall be paid thirty-seven thousand and five hundred dollars for the month, being one equal twelfth part of the minimum payment herein provided to be made for each and every year of the term aforesaid; and on the first day of August, 1867, there shall be paid a sum which, added to the said thirty-seven thousand and five hundred dollars, shall amount to thirty per cent. upon the gross earnings for the month of June preceding, so far as such earnings can be approximately ascertained according to the usual practice of railroad companies in making up their monthly accounts of gross earnings; and for each month after the said month of June payment shall in like manner be made of the excess over thirty-seven thousand five hundred dollars for such month on the first day of the second month thereafter, and as soon as practicable after the close of each year, and within sixty days after such close, the aggregate gross earnings for the whole year shall be ascertained, and the balance, if any, from one party to the other adjusted and paid in conformity to the general provisions of this agreement. As soon as experience shall show that the fixed rate of thirty per cent. for the approximate monthly payments will regularly exceed the amount to be found payable in the yearly settlements, the rate for the approximate monthly payments shall be reduced in such extent and manner as the parties hereto may agree, but not at any time so as to create a foreseen balance from the party of the first part which has the custody of the accounts and of the income.

"For the convenience of having each fiscal year terminate with the thirty-first day of December in such year, the period between the first day of June, 1867, and the first day of January, 1868, shall be adjusted and settled as if the first year had completely terminated; but provided, nevertheless, that if it shall so happen that the amount of the gross earnings for such fraction of a year shall be larger than its proportion of a whole year, such excess beyond such proportion shall not operate to reduce the rate of the percentage payable to the party of the second part for such portion of a year; all payments herein required to be made to the party of the second part shall be made in the city of New York.

"Article 8. The party of the first part shall be entitled to retain each and every year of the aforesaid term all excess of gross earnings for such year over and beyond the payments to the party of the second part in the last preceding article provided, and to apply the same to and for the purposes of this agreement, and for fulfilling all the undertakings of the said party of the first part here-

in expressed, and to apply to its own benefit any surplus which may remain in any such year as compensation for ,the services, acts and things done or to be done by the said party of the first part in pursuance of these presents.

"Article 9. The said party of the first part shall, at all times during the term aforesaid, bear and at its own proper cost and expense pay and discharge any and all costs, expenses and charges whatsoever of operating and carrying on the business of said main line of railroad and said Alton branch thereof, or either or any part of either of said railroads, or in any manner connected with, arising out of, or appertaining to business operation or management of the same; and shall and will at all times during said term hold, save and keep harmless and indemnified the said party of the second part of, from and against any and all costs, charges and expenses, suits, damages and claims of any and every kind whatsoever arising out of or in any manner appertaining to or connected with the management or operation during said term of the said railroads or either or any part of either thereof, including not only the expenses of operating and carrying on the business of said roads, but also any and all claims for injuries to persons or property occurring on said roads or either or any part of either that may occur during said term, and any and all claims, suits and demands for non-performance or breach of contract in respect to any person or thing to be transported over the same, and any and all claims and demands for the loss or destruction by whatever cause of any property whatsoever while under the control of the party of the first part or which it shall have undertaken to carry on or transport over any portion of said railroads."

"Article 12. All business destined to the east which may originate over the Belleville branch, or any extension thereof to Athens or Du Quoin shall, so far as it may be properly influenced by the said party of the second part, be sent by way of the aforesaid main line from East St. Louis to Terre Haute, and the said party of the first part hereby agrees that all business passing west over the said main line of railroad destined to points south of East St. Louis shall, as far as can be so controlled, be sent over the Belleville branch, now worked or as the same shall be when completed to Du Quoin, or to any other point south of Belleville."

The complainant delivered its road and equipment to the guarantors, on June 1, 1867, under and by virtue of the first guaranty and the lease of May 17, 1867. Soon after the execution of the first guaranty the Penn. R. R. Co. withdrew from the combination and entered into negotiations for an independent line from Pittsburgh to St. Louis. The T. H. & I. R. R. Co. failed and refused to become lessee in the operating contract. The remaining guarantors, aside from the Penn. R.

R. Co. and the Penn. Co., on August 28, 1867, caused and procured the organization of the I. & St. L. R. R. Co. to construct a railway from Indianapolis to a point on the Indiana state line, at which it would meet and intersect complainant's railway. On September 11, 1867, the I., C. & L. Ry. Co., the P., Ft. W. & C. Ry. Co., the C., C., C. & I. Ry. Co., and the L. S. & M. S. Ry. Co.—then the L. S. R. R. Co.—procured the complainant to accept the I. & St. L. R. R. Co. as lessee or party of the first part, in the place of the T. H. & I. R. R. Co. in the lease of May 17, 1867, and caused and procured complainant to enter into a supplemental agreement, by the terms of which complainant accepted the I. & St. L. R. R. Co. as lessee, and by the terms of which the I. & St. L. R. R. Co. and complainant mutually adopted the lease of May 17, 1867, under which the guarantors, except the Penn. R. R. Co. and the Penn. Co., were then in possession of the complainant's road. On the same day, September 11, 1867, the last named guarantors, with the exceptions named, made and entered into a supplemental agreement of guaranty with complainant, which was as follows:

"This indenture, made the 11th day of September, A. D. one thousand eight hundred and sixty-seven, between the Indianapolis, Cincinnati & Lafayette Railway Company of the first part, the Pittsburgh, Fort Wayne & Chicago Railway of the second part, the Bellefontaine Railway Company, the Cleveland, Columbus & Cincinnati Railroad Company, and the Cleveland, Painesville & Ashtabula Railroad Company, jointly of the third part, and the St. Louis, Alton & Terre Haute Railroad Company of the fourth part;

"Whereas, heretofore, to-wit, on or about the seventeenth day of May, one thousand eight hundred and sixty-seven, the said party of the fourth part executed a certain instrument in writing, bearing date on said last-mentioned day, and purporting to be an indenture between the Terre Haute & Indianapolis Railroad Company, and the said party of the fourth part, whereby it was agreed that the said Terre Haute & Indianapolis Railroad Company should manage, operate and carry on the business of the main line of the railroad of the said party of the fourth part, extending from Terre Haute, in the state of Indiana, to East St. Louis, in the said state of Illinois, together with the branch thereof to Alton, in the said state of Illinois, upon the terms, agreements and conditions in the said indenture mentioned and set forth, as by reference to said indenture, which, for greater convenience, is hereinafter designated and referred to as an operating contract, will more fully appear.

"And whereas, the said operating contract was duly executed by the said St. Louis, Alton & Terre Haute Railroad Company, as the party of the second part thereto, at the special instance and request of the said parties of the first, second and third parts to

these presents, and of the Pennsylvania Railroad Company, and upon the execution by or on behalf of the said parties of the first, second and third parts, and the said Pennsylvania Railroad Company, of an agreement bearing date on said last mentioned day, and which is hereinafter for more convenient reference thereto denominated an agreement of guaranty.

"And whereas, in and by the said agreement of guaranty the said parties of the first, second and third parts hereto, and the said Pennsylvania Railroad Company, for and in consideration of the execution of said operating contract by the said party of the fourth part, and of the sum of one dollar to each of them duly paid, promised, agreed, and guaranteed to and with the said party of the fourth part, to these presents; that the said Terre Haute & Indianapolis Railroad Company should, on or before the first day of July next succeeding the date thereof, duly execute and deliver to the said party of the fourth part to these presents the operating contract aforesaid, provided, however, that in case of the failure of the said Terre Haute & Indianapolis Railroad Company so to do, any other responsible corporation owning or constructing a railroad from Indianapolis to Terre Haute aforesaid, or to some point on the road of the said St. Louis, Alton & Terre Haute Railroad Company westwardly of Terre Haute aforesaid, should be accepted in lieu of the said Terre Haute & Indianapolis Railroad Company on certain conditions in the said agreement of guaranty contained.

"And whereas, in and by the said agreement of guaranty the said parties of the first, second and third parts to these presents and the said Pennsylvania Railroad Company did further promise and agree and guarantee that the said Terre Haute & Indianapolis Railroad Company, or such other corporation as might be substituted therefor, should at all times thereafter keep, observe and perform all and singular the covenants, conditions and provisions of the aforesaid contract, to-wit, the contract herein designated as an operating contract.

"And whereas, the said contract of guaranty contained the following provisions, viz.: 'Provided, nevertheless, that all the obligations of each of the said parties of the first, second, third and fourth parts created hereby, shall be several and not joint, and as to each of them for the equal fourth part of any damages arising from any default of the said Terre Haute & Indianapolis Railroad Company, or the said other corporation, or for any breach by all said parties to this agreement.'

"And whereas, the said Terre Haute & Indianapolis Railroad Company has failed to execute the aforesaid operating contract, and the said Pennsylvania Railroad Company has failed to assist or take part in providing or nominating another corporation in place of the said Terre Haute & Indianapolis Railroad Company as party of the first part to said

operating contract as contemplated by the said agreement of guaranty, and the said parties of the first, second and third parts to these presents are desirous that a corporation nominated by them shall be accepted by the said St. Louis, Alton & Terre Haute Railroad Company as party to said operating contract, in place and stead of the said Terre Haute & Indianapolis Railroad Company, but without prejudice, however, to any claim or claims which the said parties hereto, or any or either of them, have or may hereafter have against the said Pennsylvania Railroad Company arising out of the execution by or on behalf of said Pennsylvania Railroad Company of the aforesaid agreement of guaranty.

"And whereas, the said parties of the first, second and third parts have caused a new company to be duly organized under the laws of the state of Indiana, and by the name of the Indianapolis & St. Louis Railroad Company, and have requested the said party of the fourth part to accept said new company as the party of the first part to the said operating contract, and the said party of the fourth part has in compliance with such request agreed to accept the said new company in the place and stead of the Terre Haute & Indianapolis Railroad Company, but without waiving or intending to waive any claim against the said Pennsylvania Railroad Company, or any other party, arising out of anything in the premises mentioned or otherwise, and has, at the special instance and request of the parties of the first, second and third parts hereto, and in consideration of the execution of these presents, this day duly executed and delivered to the said Indianapolis & St. Louis Railroad Company, an instrument in writing bearing even date herewith, whereby the said Indianapolis & St. Louis Railroad Company has been substituted for and put in the place of the said Terre Haute & Indianapolis Railroad Company upon the terms and conditions therein and the said agreement of guaranty contained.

"Now, therefore, this indenture witnesseth. that for and in consideration of the premises, and of the sum of one dollar to each of them duly paid, the receipt whereof is hereby acknowledged, the said parties of the first, second and third parts to these presents, for themselves, their successors and assigns, have covenanted, promised and agreed, and by these presents do covenant, promise, agree and guarantee, to and with the said party of the fourth part. its successors and assigns, that the said Indianapolis & St. Louis Railroad Company shall and will at all times hereafter keep, observe and perform all and singular the covenants, conditions and provisions of the said operating contract, bearing date on the 17th day of May, in the year of our Lord 1867, and of the said instrument bearing even date herewith. by which the said Indianapolis & St. Louis Railroad Company has assumed, adopted or become liable

to carry out the said operating contract according to the true intent and meaning thereof: provided, nevertheless, that all the obligations of the parties of the first, second and third parts hereto, shall be several and not joint, and as to each of them for the equal third part of any and all damages which may arise from any default of the said Indianapolis & St. Louis Railroad Company, its successors or assigns in the premises, or for any breach of this agreement by the said parties of the first, second and third parts hereto."

In the original organization of the Indianapolis & St. Louis R. R. Co., all of the stock was taken and subscribed for by said guarantors or persons in their interest, excepting about eighty shares.

Shortly after the organization of the I. & St. L. R. R. Co., and shortly after the execution of said guaranty, the I., C. & L. Ry. Co. became financially embarrassed and withdrew from any further connection with the joint enterprise, leaving the P., Ft. W. & C. as one party, the C., C., C. & I. R. R. Co. and the L. S. & M. S. Ry. Co. jointly as the second party to carry out the joint enterprise.

The last named parties did, after the withdrawal of the I., C. & L., carry on the construction of the I. & St. L., and the business of the joint enterprise, as equal parties therein and as two parties controlling the same, instead of two out of three parties.

From June 1, 1867, until the opening for traffic of the Vandalia Line from Indianapolis to St. Louis, by the Penn. R. R. Co. and the T. H. & I. R. R. Co., the thirty per cent. of the gross earnings of complainant's road exceeded the minimum rental reserved in the lease.

In June, 1869, the Penn. R. R. Co. leased the P., Ft. W. & C. Ry., and by the terms of the lease specifically and in terms, assumed to carry out and perform the guaranty and contract in the place of the P., Ft. W. & C. Ry. Co.

In performance of this assumption the Penn. R. R. Co. took from the P., Ft. W. & C. Ry. Co. the bonds and stock of the I. & St. L., then held by the P., Ft. W. & C., and the Penn. R. R. Co. still holds a large amount of the bonds and stock of the I. & St. L. R. R. Co., either in its own name or in the name of the Penn. Co.; the latter being a corporation owned and controlled by the Penn. R. R. Co.

The officers and directors of the I. & St. L. are, and have always been, officers and directors of the said guarantor companies, or of the Penn. Co., in connection with the guarantor companies, as lessee of the P., Ft. W. & C.

Nearly all the stock of the I. & St. L. is now held and controlled by the C., C., C. & I. and the P., Ft. W. & C., or its lessee, the Penn. R. R. Co., or the Penn. Co., in equal proportions: i. e., the C., C., C. & I. representing one-half, and the P., Ft. W. & C., or its lessee, the Penn. R. R. Co., representing the other half.

A large portion of the bonds of the I. & St. L. were originally taken in equal proportions by the C., C., C. & I. and the P., Ft. W. & C., and a large amount of the different issues are now held by the defendants, the C., C., C. & I. and the Penn. R. R. Co., as lessee of the P., Ft. W. & C., either in its own name or in the name of the Penn. Co.

After the opening of the Vandalia Line as a rival route from Indianapolis to St. Louis, the Penn. R. R. Co., instead of carrying out the obligations of the P., Ft. W. & C. Ry. Co., in the guaranty and lease, diverted all the trade and traffic it could control from the Crestline Route and complainant's road, to the Pan-Handle and Vandalia Route, thereby greatly diminishing the gross receipts of complainant's road. By reason of its not complying with the lease, requiring it to own a full traffic equipment for its own and complainant's road, and by reason of the large amount of interest drawn from its earnings by defendant guarantors upon bonds held by them, the I. & St. L. Co. has become and is, insolvent, and unable to pay the rent reserved in the lease.

For some five or six years past the I. & St. L. R. R. Co. has been unable to pay its interest and the rental reserved to complainant, and recognizing the obligation resting upon them by virtue of their contracts, the C., C., C. & I., in connection with the L. S. & M. S. and the P., Ft. W. & C., or its lessee, the Penn. R. R. Co., have from time to time advanced large sums of money to the I. & St. L. to enable it to pay its interest and complainant's rental, the advancements being made in equal proportions by the C., C., C. & I. and the P., Ft. W. & C., or its lessee, the Penn. R. R. Co.

The I. & St. L. Co. has not purchased and owned, and does not own, an equipment sufficient to do the business of the line, and has been, and is, resorting to the use of hired equipment. The I. & St. L. is still in the possession of and operating complainant's road, and has received all the gross earnings and income thereof, but it has refused to pay complainant's rental, or any part thereof, since April 1, 1878, and it is retaining the rental, and unless the rental due the complainant is paid according to the terms of the lease, the mortgages upon the complainant's road, upon which interest is already due and unpaid, will be foreclosed, and the property sacrificed. These are the substantial facts stated in the bill.

The complainant prays that an account be taken of the amount due as rental under the lease from and after April 1, 1878; that the C., C., C. & I., the L. S. & M. S., the P., Ft. W. & C., the Penn. R. R. Co., and the Penn. Co. may be enjoined from selling, assigning, transferring, or parting with the mortgage or equipment bonds of the I. & St. L. R. R. Co., without first satisfactorily securing the

complainant to the extent of the interest payable on said bonds, against any default in the payment during the residue of the term created by said lease, of the rent to accrue during such term; that said complainant may have a decree against said defendants, the C., C., C. & I., the L. S. & M. S., the P., Ft. W. & C., the Penn. R. R. Co. and the Penn. Co., for a specific performance of their agreement and guaranty; that the said I. & St. L. R. R. Co. be required to specifically perform the covenants of said agreement within a reasonable time, to be fixed by the court, and that in default thereof, that the C., C., C. & I., the P., Ft. W. & C., or its representative, the Penn. R. R. Co., may be required to specifically perform the same; that a receiver may be appointed of the following portion of the earnings of the I. & St. L., to-wit: Thirty per cent. of the gross earnings of complainant's road since the first day of April last, and as they may accrue, and of so much of the earnings of the residue of the line operated by the I. & St. L. Co. as may be necessary to make up the amount of rental under said contract from month to month, or that such moneys be paid into court from time to time as they accrue under said contract, to be disbursed by the order and direction of the court; and that the I. & St. L. may be enjoined from paying any interest to any of said guarantors upon the bonds of the I. & St. L. Co. held by them, or either of them, and from paying to said guarantors, or either of them, any moneys on account of advances made by said guarantors to said I. & St. L., and that said I. & St. L. may be enjoined from paying out or using any part of thirty per cent. of the gross earnings of complainant's road, accrued since the first day of last April, or that may accrue, for any other purpose than the payment of complainant's rental reserved.

It is clear from the affidavits filed by the defendants that since 1871, the net earnings of the leased line have been less than the minimum rental, and it sufficiently appears that from time to time the C., C., C. & I., the L. S. & M. S., the P., Ft. W. & C., or its lessee, the Pennsylvania R. R. or the Pennsylvania Co., have advanced to the lessee, to enable it to operate the leased line, $1,167,-170.24; that the C., C., C. & I. has done what it could to send business over the leased road, and has never sought to divert business therefrom; that the lessor, as a corporation, or by its officers in its interest, assisted in the organization of the I. & St. L. by taking a small amount of its stock and $500,000 of its bonds.

The question argued was whether the plaintiff was entitled to a preliminary injunction. The motion was submitted on bill and affidavits, no answer having been filed. The substance of the argument by counsel for the defendants was that the I. & St. L. was organized by individuals in the ordinary way, and just as all railroad corporations

have been organized in Indiana; that it was insolvent and not able to operate its own road and the leased line and pay the minimum rental; that the leased line was a public highway, and as such the lessee must maintain it, and in doing so, might, if necessary, use the entire earnings; that if the lessee was compelled to thus use the entire earnings, the lessor had its remedy on the guaranty; that the taking of the guaranty showed this to have been what both lessor and lessee contemplated, and that full and adequate relief could be had in a court of law against the guarantors, there being no evidence that they were not perfectly solvent. It is undoubtedly true, as a general rule, that the plaintiff's remedy is at law when his demand can be satisfied with a certain sum of money.

The situation of the parties and the inducements which prompted them to enter into the several obligations have been already stated. Those in charge of and interested in the guarantor companies, except the Pennsylvania R. R. Co. and the Pennsylvania Co., took possession of the leased road June 1, 1867, and operated it until it was turned over to the I. & St. L., on the 11th of September, 1867, that being the date of the substitution of the new company as lessee, after the I. & T. H. had declined the lease, and passed under the control of the Penn. R. R. Co. as a part of the rival line, known as the "Vandalia Line." The guarantors, except the Penn. R. R. Co. and the Penn. Co., organized the I. & St. L. on the 28th day of August, 1867, and took all the stock but a fraction, which was subscribed by the leased road, and a few others.

The new company was created for the express purpose of being substituted as lessee. At the time of substitution it existed on paper only. After the substitution, and before any work was done on the new road, the I., C. & L., on account of financial embarrassment or otherwise, seems to have abandoned the joint enterprise. Whether the other parties to the combination consented to this withdrawal we are not informed. No process or relief is prayed against the I. C. & L.

It is too plain for controversy that, leaving out the Penn. R. R. Co., the Penn. Co., and the I., C. & L., the remaining guarantors built the new road and officered it in their own interest, that being the only way for them to get a line from Indianapolis to St. Louis. The new road was built in the name of the I. & St. L. as an Indiana corporation, because it could be built in no other way. Practically the companies named owned the I. & St. L., and to-day they own the stock in this road, with the exception of what is held by others to qualify them to act as directors.

The guarantors, with the exceptions named, created the lessee company for their own convenience and profit, and have never ceased to be its managers and governors.

Viewing the case as between the lessor and lessee only, the latter took the former's road, agreeing to keep it in repair and operate it, paying, as rental, thirty per cent. of the gross earnings in monthly installments at New York, where the lessor had to have money to pay interest on its bonds. Since April, 1878, no rental has been paid, and the lessee is insolvent and still in possession of the road. On these facts alone, if the guarantors had not become parties to the lease, the complainant might, with more reason and justice, be sent to a court of law. But equity will regard the I. & St. L. as the mere instrument of the companies that built its road, including the Pennsylvania Railroad Company as lessee of the P., Ft. W. & C., and while the rent is in arrear, those companies which guaranteed its payment, will not be allowed to apply the earnings in payment of interest due on bonds of the I. & St. L. held by them.

Although the Penn. R. R. Co. took no part in the organization of the I. & St. L. and the construction of its road, yet it must be remembered that some two years after the substitution of the new company as lessee, the Penn. R. R. Co. leased the P., Ft. W. & C., and expressly assumed its obligations, including this lease by name.

The I. & St. L. has never ceased to pay interest on its bonds, in the hands of the guarantors, out of the earnings of the leased road, and those companies still insist that the interest due on their bonds shall be paid whether the rental is paid or not. There is no equity in this demand, and the interest due on bonds held by the guarantors must be postponed in favor of the lessors' claim for its rental. It would be inequitable to allow those companies to collect interest on their bonds out of the earnings of the road, while the rental, which they agreed to pay in case the lessee did not, remains due and unpaid. If the guarantors are solvent, as they claim to be, they should pay the rent according to their contract, and thereby enable the lessor to pay interest on its own bonded debt, and avoid foreclosure.

If the guarantors may collect interest on their bonds out of the earnings of the road, whether the rent is paid or not, and the only remedy of the lessor is an action at law on the contract of guaranty as often as there is default in the payment of the rent, then the lease is of little value.

It was said that the lessor might re-enter and put an end to the lease. This argument will not avail the guarantors. While those companies may stand behind the I. & St. L. in law, a court of equity, regarding substance rather then shadow or form, will treat them as real owners or lessees.

A further important consideration on the question of jurisdiction remains, viz.: The right of the complainant to go into a court of equity to enforce the obligation of the Penn. R. R. Co. to pay any sum due from the P., Ft. W. & C. on its contract of guaranty. If the jurisdiction properly attaches for this purpose, as we think it does, all the parties and the subject of controversy being before the court, it will take jurisdiction for all purposes.

A preliminary injunction will not be granted, even though failure to grant it may cause some damage to the plaintiff, if granting it will inflict still greater damage to defendant; nor when the court can see that damage will result thereby to third parties. But it will not damage the guarantors to require them to pay the rental due before they appropriate earnings of the road in payment of interest on bonds of the lessee in their hands, for that is only requiring them to perform their contract.

It is no answer to this to say that the interest is a secured debt—a lien—while the rent due is a debt at large. It is doubtless true that the second contract of guaranty abrogated the first as to the parties to the second; but whether the parties who signed the first and did not sign the second are released from liability, is a question which need not now be decided.

Until final hearing, the I. & St. L. will be required to pay into court monthly for and on account of the rental, thirty per cent. of the gross earnings of the leased line, and it will be enjoined from paying to the C., C., C. & I., the L. S. & M. S., the P., Ft. W. & C., the Penn. R. R. Co. and the Penn. Co. interest on any of its mortgage or equipment bonds, owned or held by these companies, or either of them, so long as thirty per cent. of the gross earnings shall not equal the minimum rental; also from paying to such companies, or either of them, any moneys on account of advances made as aforesaid by them, or either of them, to the I. & St. L., and the said companies will be enjoined from receiving from the I. & St. L. any portion of the earnings of the leased line in payment of principal or interest of mortgage or equipment bonds of the I. & St. L., owned or held by the guarantors or either of them; also from receiving from the I. & St. L. any sum or payment, in whole or part, of advances made as aforesaid by such companies, or either of them, to the I. & St. L.; also from selling, transferring or otherwise disposing of any mortgage or equipment bonds of the I. & St. L., owned or held by said companies, or either of them.

See, also, St. Louis, A. & T. H. R. Co. v. Indianapolis & St. L. R. Co. [Case No. 12,237].

[NOTE. A final decree was entered in this case for $664,874.70, with costs, and an injunction against several of the defendants, from which both parties appealed to the supreme court. That court reversed the decree as to all defendants except the Indianapolis, St. L., etc., Co. St. Louis, A. & T. H. R. Co. v. Pennsylvania R. Co., 118 U. S. 290, 6 Sup. Ct. 1094.]